IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTINE GETMAN, an individual,

                      Plaintiff,

        v.

OREGON HEALTH AND SCIENCE
UNIVERSITY, a public corporation of the
State of Oregon,

                    Defendant.

Case No. 3:21-cv-01408-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Christine Getman ("Getman") filed this action against defendant Oregon Health and Science University ("OHSU"), alleging claims for disability discrimination under Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; and Oregon Revised Statute ("ORS") § 659A.142. OHSU moves for summary judgment on all of Getman's claims. *See* FED. R. CIV. P. 56.

///

PAGE 1 – OPINION AND ORDER

The Court has original jurisdiction over Getman's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Getman's state law claim pursuant to 28 U.S.C. § 1367, and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court grants in part and denies in part OHSU's motion.[1]

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

OHSU moves for summary judgment on three grounds: (1) Getman's claims for equitable relief are moot; (2) Getman's federal claims for compensatory damages fail as a matter of law; and (3) there is no genuine issue of material fact as to whether OHSU violated ORS § 659A.142. (Def.'s Mot. Summ. J. ("Def.'s Mot.") at 4, 8, ECF No. 30.)

---

[1] Given the parties' and Court's familiarity with the factual and procedural history of this case, the Court describes it below only as necessary to address the issues raised in the parties' motion papers.

## I.    MOOTNESS

### A.    Applicable Law

Article III of the Constitution requires that "federal courts confine themselves to deciding actual cases and controversies," and that "a live controversy persist throughout all stages of the litigation." *Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016) (quoting *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1228-29 (9th Cir. 2005) and *Burke v. Barnes*, 479 U.S. 361, 363 (1987)). The Ninth Circuit has recognized that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) (quoting *O'Neal v. City of Seattle*, 66 F.3d 1064, 1066 (9th Cir. 1995)). Consequently, "[a] request for injunctive relief remains live only so long as there is some present harm left [for the district court] to enjoin." *Id.* (quoting *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)).

Consistent with this understanding, the Ninth Circuit has explained that a plaintiff's "claim for injunctive relief becomes moot once subsequent events have made clear the conduct alleged as the basis for the requested relief 'could not reasonably be expected to recur.'" *Id.* (quoting *Ruiz v. City of Santa Maria*, 160 F.3d 543, 548-49 (9th Cir. 1998)). A plaintiff has "no claim for an injunction" if he "cannot reasonably be expected to benefit from prospective relief ordered against the defendant." *Id.* (citing *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 364-65 (2011)).

### B.    Analysis

OHSU argues that Getman is not entitled to equitable relief because her claims are moot. (*See* Def.'s Mot. at 4-8, citing the mootness doctrine and arguing that Getman is "not entitled to

equitable relief," as "there is no substantial [live] controversy to warrant [such] relief"). The Court disagrees.

### 1.    Getman's Requests for Injunctive Relief

Getman suffers from Type II spinal muscular atrophy and, as a result, has little to no use of the muscles below her neck, uses a wheelchair, ventilator, and tracheostomy tube, and requires the support of a 24/7 caregiver. (Decl. Christine Getman ("Getman Decl.") ¶¶ 1-5, 13, ECF No. 35.) Getman's claims stem from OHSU's enforcement of "[t]emporary visitor guidelines," also known as the "temporary no visitor policy," in early April 2020, when the COVID-19 virus was spreading throughout the United States and OHSU admitted Getman to its hospital for treatment of bacterial meningitis.[2] (*See* Decl. Matthew Ellis Opp'n Def.'s Mot. Summ. J. ("Ellis Decl.") Ex. 36 at 1, ECF No. 38-11 (bold omitted); *id.* Ex. 40 at 2, ECF No. 38-12; Getman Decl. ¶¶ 10-14.)

In her complaint, Getman seeks equitable relief in the form of injunctions, including one related to OHSU's "current or future no-visitor policy." (Second Am. Compl. ("SAC") at 20-21, ECF No. 28); *see Bayer*, 861 F.3d at 864 ("Injunctive relief constitutes a traditional equitable remedy."); *Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 722 (9th Cir. 2021) (noting that an injunction is a "form[] of equitable relief"). Specifically, Getman seeks injunctions requiring OHSU to:

1.    "provide [Getman] with reasonable modifications of its hospital policies, including any current or future no-visitor policy, if necessary to provide [Getman] full and equal advantages and privileges to [OHSU's] health services,"

---

[2] The temporary visitor guidelines (hereinafter, the "no visitor policy") OHSU had in place in early April 2020 stated that subject to exceptions not applicable here, "NO VISITORS are allowed in the hospital at this time." (Ellis Decl. Ex. 36 at 1 (bold omitted); *see also id.* Ex. 40 at 2.)

2. "create [and place] a written accommodation plan . . . in [Getman's] medical records that allows [her] support person to attend all medical appointments and procedures at all OHSU clinics, in the OHSU emergency department, and the OHSU hospital to assist [her] with effective communication and/or her daily living tasks, such as eating, toileting, repositioning, or disability-related needs,"

3. "have a Section 504/Title II/Section 1557 disability coordinator on site to coordinate and address patient requests for reasonable modifications of policies during . . . a hospital stay,"

4. "train[] . . . all hospital management responsible for granting or denying requests for reasonable modifications of the legal requirements pertaining to reasonable modifications under Title II of the ADA, Section 504 of the [RA], Section 1557 of the ACA[,] and ORS 659A.142," and

5. "train[] . . . all hospital management on the rights of persons with disabilities to have a support person and/or caregiver present if needed to assist that person with disability-related tasks."

(SAC at 20-21.)

## 2.    The Parties' Positions

OHSU argues that Getman is not entitled to equitable relief because the complained-of policy "no longer exists," OHSU's current policy allows patients to have up to two visitors per day, and the Oregon Legislature passed Senate Bill 1606 ("SB 1606"), now codified at ORS § 441.049, "mandating that hospitals allow disabled patients to have support people present at all times."[3] (Def.'s Mot. at 4-8, citing Decl. Karen O'Kasey Supp. Def.'s Mot. Summ. J. ("O'Kasey Decl.") Ex. 2 at 1, ECF No. 31-2.) In other words, OHSU argues that Getman's requests for injunctive relief are moot given the change in OHSU's visitor policy and the passage of SB 1606. (*Id.*)

///

---

[3] Section 441.049 requires that hospitals "allow a patient to designate at least three support persons, and . . . [have] at least one support person . . . present . . . at all times . . . during the patient's stay at the hospital, if necessary to facilitate the patient's care[.]" OR. REV. STAT. § 441.049(2).

Getman disagrees with OHSU's mootness argument and emphasizes that she "seeks multiple other forms of equitable relief . . . beyond repeal of OHSU's former visitor policy [i.e., injunction requests (2)-(5) above]." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 18-21, ECF No. 33.) Getman also argues that because OHSU has failed to demonstrate that it is "absolutely clear" that the alleged wrongful behavior addressed in her first injunction request (i.e., OHSU's decision not to allow Getman's 24/7 caregiver to be present during a hospital admission) cannot reasonably be expected to recur, the mootness doctrine does not apply. (*Id.* at 14-18.)

### 3.    Disposition

The Court concludes that OHSU has not satisfied its heavy burden of demonstrating mootness.

"In seeking to have a case [or claims for injunctive relief] dismissed as moot[,] . . . the defendant's burden is a heavy one." *Nat. Res. Def. Council v. Cnty. of L.A.*, 840 F.3d 1098, 1101 (9th Cir. 2016) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987)). In fact, "[t]he defendant must demonstrate that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Gwaltney,* 484 U.S. at 66).

A defendant "may do so by persuading the court that 'the change in its behavior is entrenched or permanent,'" *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1152 (9th Cir. 2019) (quoting *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018)), and thus there remains no effective or possible relief a court can provide. *See Bayern*, 861 F.3d at 862 ("The party asserting mootness bears the heavy burden of establishing that there remains no effective relief a court can provide."); *Johnson v. Baker*, 23 F.4th 1209, 1214 n.2 (9th Cir. 2022) (noting that a claim for injunctive relief is "moot only if it is impossible for [the] court to grant relief")

(simplified). OHSU has not demonstrated that there remains no effective or possible relief the Court can provide.

### a.      Getman's First Request for Injunctive Relief

As to Getman's first request for injunctive relief, which pertains to OHSU's past prohibition of Getman's caregiver during her hospital admission, OHSU falls short of meeting its burden.

The Ninth Circuit has recognized that "a lack of 'procedural safeguards insulating the new state of affairs from arbitrary reversal' can counsel against mootness." *Am. Diabetes Ass'n*, 938 F.3d at 1153 (quoting *Fikre*, 904 F.3d at 1039). As OHSU acknowledges, SB 1606 requires that a hospital allow a caregiver to be present during a patient's admission "if [it is] necessary," but leaves it to the hospital's "discretion as to what is considered 'necessary.'" (Def.'s Reply Supp. Summ. J. Mot. ("Def.'s Reply") at 6, ECF No. 42, quoting O'Kasey Decl. Ex. 1 at 1, ECF No. 31-1.) Given this discretion, SB 1606's requirements fail to make it absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur. (*Cf.* Dep. Susan Yoder ("Yoder Dep.") 82:23-85:16, May 2, 2022, ECF No. 38-18, reflecting that at the time of Getman's admission, OHSU's director of patient relations had the discretion to evaluate requests for exceptions to the no visitor policy, and therefore "interpret[ed] the policy and ma[de] decisions").

OHSU emphasizes that its current visitor policy allows patients to have up to two caregivers present per day and does not give hospital staff the discretion to decide whether a patient's caregiver is necessary. (Def.'s Reply at 6.) OHSU also asserts that Getman's "argument that she might not be allowed to have her caregiver present in the future is baseless speculation," and relying on an Eleventh Circuit case, OHSU adds that it is "entitled to a presumption that it will not resume the challenged activity." (Def.'s Reply at 7) (citation omitted).

In this circuit, a court "presume[s] that a government entity is acting in good faith when it changes its policy, but when[, as here, such an entity] asserts mootness based on [policy] change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (citations omitted). There is no dispute that COVID-19 variants continue to spread throughout the United States, disease outbreaks remain an ongoing concern for hospitals, and OHSU can make changes to its visitor policy to address such matters. (*See* O'Kasey Decl. Ex. 2 at 1, the current visitor policy addresses ongoing restrictions due to COVID-19 and states that OHSU "may make changes to this policy in extreme cases," "always ha[s] strict controls in place to stop the spread of infection," and "always has plans in place for disease outbreaks"). Accordingly, OHSU has not met its heavy burden of showing that the challenged conduct cannot reasonably be expected to recur. *See ASW v. Oregon*, 424 F.3d 970, 973 (9th Cir. 2005) (explaining that it was "probable" that the defendant would respond in the same manner "when faced with a similar . . . crisis," and given that "very real possibility," the defendant had not met its "heavy burden").

### b.    Getman's Remaining Requests for Injunctive Relief

Getman also seeks injunctions requiring OHSU to (1) create and place a written accommodation plan in Getman's medical records allowing Getman's support person to attend all medical appointments and procedures at OHSU facilities, and assist Getman with effective communication and/or daily living tasks, (2) have an ADA, RA, and ACA coordinator on site to manage and address patient requests for reasonable modifications of policies during a hospital stay, and (3) train hospital management on certain legal requirements and the rights of persons with disabilities.

///

OHSU argues that these requests are not appropriate relief in a single-plaintiff case, that training and staffing decisions amount to disfavored system-wide injunctive relief, and that the described accommodation plan conflicts with SB 1606's discretionary language. (Def.'s Reply at 7-9.) OHSU presented these arguments regarding Getman's remaining claims for injunctive relief for the first time in its reply brief. (*See* Def.'s Mot. at 4-8, addressing only whether Getman was entitled to any injunctive relief in light of OHSU's change in policy and the passage of SB 1606.) During oral argument, OHSU asserted that it was appropriate to raise these arguments for the first time in its reply because they address arguments Getman raised in opposition to OHSU's motion.

OHSU's remaining arguments were not properly raised before this Court as bases for granting summary judgment on Getman's remaining claims for injunctive relief, and thus the Court declines to resolve them at this time and on the current record. *Cf. United States v. Villalba*, No. 21-30279, 2022 WL 16832813, at *1 (9th Cir. Nov. 9, 2022) (declining to address the movant's "additional argument [as to why] he was entitled to compassionate release," noting that the movant "first made [the additional] argument in his reply brief," and explaining that "[b]ecause the argument was not properly raised before the district court, it [was] forfeited" and the district court did not need to consider it) (citations omitted). For present purposes, it is sufficient to find (as the Court does) that OHSU has failed to meet its heavy burden of showing that the principal conduct at issue—OHSU's no visitor policy and related decision not to allow Getman's caregiver to be present during her hospital admission—cannot reasonably be expected to recur.

To be sure, OHSU based its opening motion on the argument that a policy change and the passage of SB 1606 mooted Getman's "request[] for equitable relief in the form of an order

requiring that OHSU modify its 'No-Visitor' policy so [she] may have her support person attend all future medical appointments and procedures at all OHSU clinics, in the OHSU emergency department, and the OHSU hospital." (*See* Def.'s Mot. at 4-8.) Thus, OHSU's opening motion addressed only Getman's first request for injunctive relief. As to this request, OHSU has failed to meet its heavy burden of demonstrating mootness. (*Compare* Def.'s Mot. at 5, relying on the mootness doctrine and arguing that "OHSU is prohibited by state law from preventing [Getman] from having her own caregiver with her at all times," *with* Def.'s Reply, arguing that allowing Getman's caregiver to "attend all medical appointments and procedures at OHSU without exception . . . would impose a requirement on OHSU stricter than SB 1606").

The Court also notes that (1) one of Getman's treating physicians at OHSU previously suggested that Getman "may be an excellent candidate for a formal [c]are [p]lan so that any future hospitalizations are smoother for her" (Ellis Decl. Ex. 27 at 2, ECF No. 38-9); and (2) OHSU's reply brief, the current record, and the arguments presented during oral argument fail adequately to address whether any of Getman's remaining requests for injunctive relief could *possibly* be tailored in a more narrow and specific way to remedy the specific harms alleged. *See generally Galvez v. Jaddou*, No. 20-36052, --- F.4th ---- , 2022 WL 16643107, at *8 (9th Cir. Nov. 3, 2022) (explaining that "the district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction, [but] the injunction must be tailored to remedy the specific harm alleged," and that "specific tailoring is particularly important where relief can be structured on an individual basis, and where injunctive relief is granted against a state agency or official") (simplified); *see also Johnson*, 23 F.4th at 1214 n.2 (noting that a claim for injunctive relief is "moot only if it is impossible for [the] court to grant relief") (simplified).

For these reasons, the Court denies OHSU's motion to the extent it is based on mootness grounds.

## II.    COMPENSATORY DAMAGES

Relying on the Supreme Court's recent decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022), OHSU argues that Getman's federal claims for compensatory damages (emotional distress damages under the ADA, RA, and ACA) fail as a matter of law. (Def.'s Mot. at 8.) During oral argument, Getman acknowledged that her federal claims for compensatory damages fail as a matter of law. Accordingly, the Court grants OHSU's motion for summary judgment on Getman's federal claims for compensatory damages.

## III.    STATE LAW CLAIM

OHSU moves for summary judgment on Getman's state law claim, which alleges that OHSU discriminated against Getman on the basis of her disability, in violation of ORS § 659A.142(4). As discussed below, genuine issues of material fact preclude summary judgment in OHSU's favor.

### A.    Preliminary Matter

OHSU raises evidentiary objections regarding a declaration and eight exhibits that Getman cited in opposition to OHSU's motion for summary judgment on her state law claim. (Def.'s Reply at 2-6.)

The Court's analysis does not rely on any of the disputed evidence, and therefore the Court overrules as moot OHSU's evidentiary objections. *See Kim v. Gordon*, No. 10-cv-01086-HZ, 2011 WL 3299813, at *1 (D. Or. Aug. 2, 2011) ("Because [the court's summary judgment] analysis does not rely on any of the disputed evidence, the parties' [evidentiary] objections are overruled as moot.") (all caps omitted); *Zelda B. v. City of Oakland*, No. 21-cv-07078, 2022 WL 16556790, at *11 n.7 (N.D. Cal. Oct. 31, 2022) ("The objection is denied as moot as the court

does not rely on these materials in reaching its decision on the motion [for summary judgment].").

### B.    Applicable Law

ORS § 659A.142 provides, in relevant part, that "[i]t is an unlawful practice for any place of public accommodation, resort or amusement as defined in ORS 659A.400, or any person acting on behalf of such place, to make any distinction, discrimination or restriction because a customer or patron is an individual with a disability." OR. REV. STAT. § 659A.142(4). ORS § 659A.400(1) defines a "place of public accommodation" as, among other things, "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." OR. REV. STAT. § 659A.400(1)(a).

Pursuant to a "lockstep" statute, "Oregon courts must construe ORS 659A.103 to 659A.145 'to the extent possible in a manner that is consistent with any similar provisions of the . . . [ADA].'" *Fenimore v. Blachly-Lane Cnty. C.E.A.*, 441 P.3d 699, 706 (Or. Ct. App. 2019) (quoting OR. REV. STAT. § 659A.139). ORS § 659A.142(4)'s federal counterpart is Title III of the ADA. *See id.* (referring to Title III as the counterpart to ORS § 659A.142(4), which "protects a more specific and limited subset of individuals than Title III," i.e., "customers" and "patrons," not just "individuals"); *A.F. v. Starbucks Corp.*, No. 3:17-cv-01582-SI, 2018 WL 1161385, at *4 (D. Or. Mar. 5, 2018) (setting forth the requirements of a claim under ORS § 659A.142(4) and turning to Title III of the ADA); *see also* 42 U.S.C. § 12182(b)(2)(A) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]").

///

PAGE 12 – OPINION AND ORDER

"Both [Title III of] the ADA and Oregon's anti-discrimination laws require that places of public accommodations make reasonable modifications to ensure access to their goods and services by those with disabilities." *Marquard v. New Penn Fin., LLC*, No. 3:17-cv-00549-SI, 2017 WL 4227685, at \*10 (D. Or. Sept. 22, 2017) (citing 42 U.S.C. § 12182(b)(2)(A) and OR. ADMIN. R. 839-006-0330 in addressing the same claim at issue here). Title III of the ADA states that discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities[.]" 42 U.S.C. § 12182(b)(2)(A). Oregon Administrative Rules ("OAR") similarly provide that (1) "[p]laces of public accommodation must remove . . . administrative barriers, if readily achievable (as defined in OAR 839-006-0310) in order to make offered goods and services accessible," and (2) "[i]f barrier removal is not readily achievable, places of public accommodation must take alternative steps . . . , such as . . . relaxing administrative policies." OR. ADMIN. R. 839-006-0330(1)-(2).

## C.    Analysis

OHSU does not dispute that it is a "place of public accommodation," as that term is defined in ORS § 659A.400. *See Roberts v. Legacy Meridian Park Hosp., Inc.*, No. 3:13-cv-01136-SI, 2014 WL 294549, at \*5 (D. Or. Jan. 24, 2014) ("Meridian Park provides medical services to the public and is therefore a public accommodation within the definition stated in OR. REV. STAT. [§] 659A.400(a)(1)."). Nor does OHSU dispute whether Getman qualifies as a "customer or patron" under ORS § 659A.142(4). *See Abraham v. Corizon Health, Inc.*, 511 P.3d 1083, 1087 (Or. 2022) (explaining that to prevail on "a claim under ORS 659A.142(4), [a] plaintiff must . . . show that he was a 'customer or patron' who was subjected to 'any distinction, discrimination or restriction' by [the] defendant or its agents because he 'is an individual with a disability'").

OHSU, however, asserts that there is no genuine issue of material fact as to whether it violated ORS § 659A.142(4). (Def.'s Mot. at 8-18.) OHSU maintains that it "[c]ompli[ed]" with the statute. (*Id.* at 8) (bold typeface omitted). As explained below, the Court denies OHSU's motion because genuine issues of material fact preclude summary judgment in its favor.

As an initial matter, OHSU argues that Oregon law does not require places of public accommodation to provide "reasonable accommodations" to disabled customers or patrons. (*See, e.g.*, *id.* at 9, arguing that "there is no requirement under ORS 659A.142 to provide reasonable accommodations"). During oral argument, OHSU acknowledged what the authorities above make clear: Places of public accommodation must make "reasonable *modifications* to ensure access to their goods and services by those with disabilities." *Marquard*, 2017 WL 4227685, at *1 (emphasis added). With that understanding, the Court turns to the merits of Getman's state law claim.

Getman alleges that OHSU violated ORS § 659A.142(4) by subjecting her to "distinction[], discrimination or restriction[] because of [her] disability[.]" (SAC at 19.) Getman alleges that OHSU did so in several ways, including by failing to: (1) "make reasonable modifications in policies, practices, or procedures, when such modifications were necessary to avoid discrimination in [OHSU's] services, programs, or activities, and when such modifications would not be unduly burdensome and would not fundamentally alter the nature of services provided by [OHSU]," and (2) "provide [Getman] as equally an effective method of communication as is provided to other patients at [OHSU's] health-care facility." (SAC at 19.) In support, Getman relies largely on OHSU's refusal to allow her 24/7 caregiver to be present during her hospital admission, and refusal to modify or deem her case worthy of an exception to OHSU's no visitor policy (like OHSU did for other patients), even though Getman needs "24-

hour support from a caregiver" to communicate effectively, suction and clean her tracheostomy

tube, reposition her body to "avoid significant pain," and "perform the activities of daily living

that she cannot perform due to her limited motor functions, including but not limited to eating,

bathing, toileting, and other daily needs." (SAC at 2-3, 7-8, 11 19; Getman Decl. ¶¶ 2-14; Pl.'s

Opp'n at 22 n.5.)

OHSU argues that because Getman "received successful treatment for her bacterial

meningitis," albeit "not in the particular manner she desired," there is no genuine issue of

material fact as to whether Getman "received meaningful access to the public benefit offered by

OHSU." (Def.'s Mot. at 10-11.) OHSU adds that any "subjective unhappiness about nursing care

is insufficient to create a triable issue of fact about whether OHSU denied [Getman] access to

medical care." (*Id.* at 14.) The Court disagrees with OHSU's framing of the facts at this stage,

and relevant inquiry.

Considering that OHSU does not dispute that it is a place of public accommodation or

that Getman was a customer or patron, the Court must first inquire into whether OHSU subjected

Getman to "any distinction, discrimination or restriction" because she is an individual with a

disability. *See Abraham*, 511 P.3d at 1087 (stating that a plaintiff asserting a claim under ORS

§ 659A.142(4) must "show that he was . . . subjected to 'any distinction, discrimination or

restriction' by [the] defendant or its agents because he 'is an individual with a disability'"); *see

also* OR. ADMIN. R. 839-006-0300(1) ("No place of public accommodation may discriminate

against an individual by any distinction or restriction on the basis of disability."); *A.F.*, 2018 WL

1161385, at *4 ("Plaintiff has not alleged, as Oregon law requires, that Defendant made 'any

distinction, discrimination, or restriction because' [he] was an individual with a disability."). The

question, then, is what constitutes "any distinction, discrimination or restriction" on the basis of a

PAGE 15 – OPINION AND ORDER

protected status. *Cf. King v. Greyhound Lines, Inc.*, 656 P.2d 349, 350-51 (Or. Ct. App. 1982) ("The issue is whether racial insults made by an employee of a place of public accommodation to a customer in the course of serving that customer constitute a 'distinction, discrimination or restriction on account of race' in contravention of [a public accommodation discrimination statute].").

In *King*, the Oregon Court of Appeals addressed that question in evaluating a claim under former ORS § 30.670, which "entitles all persons to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation without any distinction, discrimination or restriction on account of race."[4] 656 P.2d at 349-51 (simplified). "The trial court, sitting without a jury, found that racial slurs made by [the] defendant's employee during the course of employment did not constitute a violation of the [statute] and entered judgment for [the] defendant." *Id.* at 349-50. In reversing that decision, the Oregon Court of Appeals first addressed "whether racial insults made by an employee of a place of public accommodation to a customer in the course of serving that customer constitute[d] a 'distinction, discrimination or restriction on account of race' in contravention of [the statute]." *Id.* at 350-51 (simplified).

Recognizing that there was "little legislative history describing what is meant by the terms 'distinction, discrimination or restriction,'" the Oregon Court of Appeals held that the prohibition against "distinction, discrimination or restriction" on the basis of race encompassed "serving customers of one race in a manner different from those of another race," not just the

---

[4] Under the ADA, individuals with disabilities are entitled to "full and equal enjoyment" of the services of any place of public accommodation. *See* 42 U.S.C. § 12182(b)(2)(A) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]").

"outright denial of service." *Id.* at 351-52. In support of its holding, the Oregon Court of Appeals

emphasized that both "[e]xclusion and unequal treatment . . . form the core of any public

accommodation violation . . . covered by . . . statute[]," the interpretation that "verbal abuse can

be a 'distinction, discrimination or restriction' on the basis of race is consistent with [the

statute's] broad legislative purpose," and such an "interpretation recognizes that the chief harm

resulting from . . . discrimination by establishments serving the general public is . . . unequal

treatment, which is the injury to an individual's sense of self-worth and personal integrity." *Id.*

(simplified).

      The Court agrees with Getman that *King*'s interpretation of the phrase "distinction,

discrimination or restriction" is persuasive and should apply here. (*See* Pl.'s Opp'n at 25.)

Although the statute at issue in *King* protects a broader group of individuals, *see Fenimore*, 441

P.3d at 707-08 & n.6 (holding that "ORS 659A.142(4) protects a more specific and limited

subset of individuals [i.e., individuals with disabilities who are 'customers' or 'patrons,'] than

[its counterpart,] the Title III protections for 'individuals,'" and relying on "statutory context"

provided by "*former* ORS 30.670[, which has been] renumbered as ORS 659A.403"), as in *King*,

there is no dispute that Getman qualifies for protection under, and OHSU's actions were

governed by, the statute. Thus, the Court's analysis should begin with the phrase "distinction,

discrimination or restriction," which the Oregon Court of Appeals addressed in *King*. *See*

*Fenimore*, 441 P.3d at 707 ("[W]e [must] presume that the legislature chose the language that it

did in ORS 659A.142(4) purposefully and that the text of a statute is the best indicator of the

legislature's intent").

      Further, and similar to the situation in *King*, the statement of policy set forth in ORS

§ 659A.103 "compels [Oregon courts] to interpret statutes under ORS chapter 659A as broadly

as the specific language of those statutes allow." *See id.* at 707 (stating as much and noting that "[s]tatements of statutory policy are considered useful context for interpreting a statute"). As a result, a broad interpretation of any "distinction, discrimination or restriction" that encompasses unequal treatment of individuals with disabilities is appropriate and consistent with the legislative purpose. Such an interpretation also recognizes the distinct harm resulting from the unequal treatment of individuals with disabilities. *See Williams v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 958 P.2d 202, 205 (Or. Ct. App. 1998) ("Oregon's statutes gradually have expanded to prohibit disabled persons from differential treatment in a host of contexts, including places of public accommodation[.] . . . [The] extensive legal framework amply reflects our social sensitivity to the distinct injuries that accrue from attitudes and behavior that single out disabled persons.").

Consistent with *King*, the Court finds that ORS § 659A.142(4)'s use of the phrase "any distinction, discrimination or restriction" encompasses the unequal treatment of individuals with disabilities. There is a genuine issue of material fact as to whether OHSU subjected Getman to unequal treatment, or served Getman in a manner different from members of the public without disabilities.

Specifically, Getman requires support from a trained and approved 24/7 caregiver because she has little to no use of the muscles below her neck, needs assistance eating and with toileting care, and cannot "maintain[] a clear airway for breathing," set up or use any "assistive technology for communicating," independently suction or clean her tracheostomy tube to ensure "proper and safe breathing," communicate effectively, or reposition her body to "avoid significant pain from remaining in one position for too long" and "slow the progression" of muscle atrophy, which can be "fatal." (Getman Decl. ¶¶ 2-13.) During her April 2020 hospital

admission, Getman experienced "significant pain" and difficulty breathing when she was "left alone for approximately 4-5 hours" in an "incorrect position[]" and unable to alert medical staff. (*Id.* ¶ 11.) During that time, Getman "could feel [mucus] secretions drying in [her] lung and . . . tracheostomy tube which can cause a mucus plug to block [her] airway," and feared she might "suffocate and die," as plugs are a "common cause of death" for people with her condition. (*Id.*) On one occasion, Getman also had to "lay in [her] own excrement in bed until the nurse returned," which Getman testified was "extremely dehumanizing and humiliating." (*Id.* ¶ 12.)

The record reflects that OHSU made exceptions for and served other non-disabled patients during the same time period. (*See, e.g.*, Yoder Dep. 69:13-72:17, reflecting that OHSU made exceptions to its no visitor policy for patients giving birth because "birth is a pivotal moment in most people's lives and considered a sacred moment to . . . have support," as well as for adults with dementia or significant developmental delays who worked with someone "every day" who made them "feel safe"). Given these facts, and regardless of whether OHSU successfully and properly treated Getman's bacterial meningitis, there is a genuine issue of material fact as to whether OHSU's decision to exclude Getman's 24/7 caregiver amounted to OHSU subjecting Getman to unequal treatment.

In its opening motion, OHSU suggests that it could not have allowed Getman's caregiver to be present during her admission "without fundamentally altering the nature of the program or activity it offers—safe healthcare services," and that Getman's request was "unreasonable at the time based on the novel emergence of COVID." (Def.'s Mot. at 10.) OHSU also suggests that it has met its burden of establishing a "direct threat" affirmative defense. (*Compare id.* at 10-17, discussing "direct threat" but focusing the argument on whether Getman received meaningful access to care, "just not in the particular manner she desired," *with* Def.'s Reply at 14-18,

addressing Getman's argument about OHSU's alleged failure to meet its burden of establishing
its "direct threat" defense and identifying for the first time factors relevant to such an analysis).

"Anti-discrimination laws do not . . . require an establishment to permit an individual to
participate in its services when that individual poses a direct threat to the health or safety of
others." *D.W. v. Fresenius Med. Care N. Am.*, 534 F. Supp. 3d 1274, 1283 (D. Or. 2021)
(simplified); *see also* OR. ADMIN. R. 839-006-0335(1)-(2) ("Places of public accommodation
may refuse to permit an individual with a disability to participate in or benefit from the goods,
services, facilities, privileges, advantages and accommodations of the public accommodation if
the individual with a disability poses a direct threat to the health or safety of others. Direct threat
means significant risk of substantial harm that cannot be eliminated or reduced below the level of
significant risk of substantial harm by a modification of policies, practices or procedures, or by
the provision of auxiliary aids or services."). Notably, "[b]ecause it is an affirmative defense, the
burden of establishing a direct threat lies with the [defendant]," and "[t]hat burden is a 'heavy'
one." *Fresenius*, 534 F. Supp. 3d at 1284-85 (quoting *Echazabal v. Chevron USA, Inc.*, 336 F.3d
1023, 1027 (9th Cir. 2003) and *Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066
(9th Cir. 2007)).

To be entitled to summary judgment, OHSU must demonstrate that there is no genuine
issue of material fact regarding its "direct threat" affirmative defense. *Cf. Nichols v. Nw. Mut.
Life Ins. Co.*, 487 F. App'x 339, 341 (9th Cir. 2012) ("Waiver is an affirmative defense, upon
which [the non-moving party in this instance bore] the burden of proof, and [thus] he ha[d] to
show a genuine issue of material fact regarding waiver to defeat summary judgment."). OHSU
has failed to do so. *See generally Fresenius*, 534 F. Supp. 3d at 1287 (explaining that a
defendant's "good-faith belief that the individual poses a direct threat does not satisfy [the

heavy] burden," and that the "ADA requires a more particular showing," which is
"understandable given the history of discrimination against disabled individuals that the ADA
sought to remedy").

OHSU offers little in response to Getman's argument that OHSU's different treatment of,
among others, non-disabled patients who were giving birth, defeats its direct threat defense. (*See*
Def.'s Reply at 14-17.) OHSU responds only that Getman (1) is challenging whether "OHSU's
risk assessment was invalid" because it "still permitted some visitors" and thus "did not
*eliminate* the spread of COVID," and (2) "ignores the public health information available at the
time that the relevant risk in the context of a pandemic was a matter of degree." (*Id.* at 15.)

However, Getman correctly points out that the record reflects that OHSU allowed a guest
for patients giving birth (among others) while excluding Getman's 24/7 caregiver during the
same time period. There is no evidence in the record to explain why some patients' guests would
fundamentally alter "safe healthcare services" and pose a "direct threat" to the health and safety
of others during the early days of the COVID-19 pandemic, and other guests would not. Thus,
OHSU has not demonstrated that Getman's 24/7 caregiver posed a significant safety risk
different than the risk posed by non-disabled patients' guests. Accordingly, the Court denies
OHSU's motion for summary judgment on its "direct threat" affirmative defense.

///

///

///

///

///

///

PAGE 21 – OPINION AND ORDER

**CONCLUSION**

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART OHSU's

motion for summary judgment (ECF No. 30). Specifically, the Court enters summary judgment

for OHSU on Getman's federal claims for compensatory damages, but all other claims will

proceed to trial.

**IT IS SO ORDERED.**

DATED this 22nd day of November, 2022.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge